IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERAEUS ELECTRO-NITE CO. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MIDWEST INSTRUMENT | : | |
| COMPANY, INC. | : | NO. 06-355 |

## MEMORANDUM

**Padova, J.**                                                                 **July 12, 2007**

Plaintiff Heraeus Electro-Nite Co. ("HEN") has brought this patent infringement action concerning U.S. Patent No. 4,964,736 (the "'736 patent"), entitled "Immersion Measuring Probe for Use in Molten Metals."   Currently before the Court is a motion by Defendant ("Minco") for summary judgment on laches and equitable estoppel.  For the reasons that follow, the Motion is denied.

## I.    PROCEDURAL HISTORY

HEN filed the Complaint in this action on January 26, 2006, alleging that it is the owner of the entire interest in and right to the '736 patent, and that Minco has infringed that patent.  In its Seconded Amended Answer and Counterclaim, Minco asserted various affirmative defenses, including that this action is barred or limited under the doctrines of laches and/or equitable estoppel. On March 9, 2007, Minco filed the instant Motion for Summary Judgment seeking judgment in its favor based on both laches and equitable estoppel.

## II.    FACTUAL BACKGROUND

Both HEN and Minco make and sell various types of probes, thermocouples, and other measuring devices and related equipment for use in steel making.  (Def. Statement of Material Fact

"SMF" ¶ 8.)  Though they are competitors, HEN and Minco have corresponded and communicated with each other on various potential patent and technology disputes going back to the 1970's.  (Def. SMF ¶ 9, Pl. SMF ¶ 9.)  Despite this history, no one from HEN ever discussed the '736 patent with anyone from Minco (Pl. SMF ¶ 92, Def. SMF ¶ 92), or gave Minco notice of HEN's claim of patent infringement, prior to the filing of this suit.  (Def. SMF ¶ 106, Def. App. H at 147-148.)

Minco manufactures oxygen probe models 215 and 225.  (Def. SMF ¶ 5.)  Although model 215 has been on the market since 1999 (Def. SMF ¶ 6, Pl. SMF ¶ 6), HEN claims that it was aware of only a prototype of that model in November 1999, and did not know that any of the probes in this lawsuit were being sold in the marketplace at that time.  (Pl. App. K, Conti Aff. ¶¶ 8-9.)  Minco asserts that the 225 probe has been on the market since 2000.  (Def. SMF ¶ 6, Def. App. E ¶ 27.)  HEN, however, disputes this assertion because Minco did not report any sales of the 225 probe in the United States until 2001.  (Pl. SMF ¶ 6, Pl. App. O.)

In November 1999, HEN obtained samples of Minco's oxygen probes and Richard Conti, HEN's director of research and development, conducted a competitive analysis of them.  (Def. SMF ¶ 97, Pl. SMF ¶ 97.)  As part of this analysis, Mr. Conti dipped the probes into molten steel to test their performance, and then dissected them and analyzed their internal components.  (Def. SMF ¶ 98, Pl. SMF ¶ 98.)  Mr. Conti informed HEN's sales department of his findings.  (Def. SMF ¶ 99, Pl. SMF ¶ 99.)  In March 2000, Mr. Conti discussed a Minco probe he thought may infringe the '736 patent with his Belgian colleagues, Messrs. Plessers and Vangeel.  (Def. SMF ¶ 108, Pl. SMF ¶ 108.)

In March 2001, Mr. Conti conducted an infringement analysis on Minco's probes after Minco's sales became commercially significant.  (Pl. App. K, Conti Aff. ¶ 12.)  HEN believed, based on this infringement analysis, that the Minco probes utilized features of the '736 patent and decided

that further action to enforce the patent was warranted.  (Pl. App. K, Conti Aff. ¶ 13.)

Prior to asserting an infringement claim, HEN decided to pursue a reexamination of the '736 patent in or around June 2001.  (Pl. App. K, Conti Aff. ¶ 14; Pl. App. D, Sickles Aff. ¶ 3.)  The purpose of the reexamination was to ensure that certain Japanese prior art references, which were brought to HEN's attention in 1994 by a competitor in a prior dispute relating to the '736 patent, did not present a problem regarding the patent's viability.  (Pl. App. K, Conti Aff. ¶ 14.)  Before placing the '736 patent into reexamination, HEN needed to complete several intermediate steps.  (Pl. App. K, Conti Aff. ¶ 15; Pl. App. D, Sickles Aff. ¶ 4.)  First, HEN attempted to obtain complete translations of the Japanese references from foreign affiliates.  (Pl. App. K, Conti Aff. ¶ 17; Pl. App. D. ¶ 8.)  When that was unsuccessful, translations were performed by a U.S. translation service, and HEN obtained certified copies of these translations in July 2003.  (Pl. App. D ¶ 8.)  Also, in preparation for the reexamination, HEN learned that a maintenance fee on the '736 patent had not been paid.  (Pl. App. D ¶ 10.)  After determining that the failure to pay was unintentional, HEN prepared and filed a petition to reinstate the patent, which was granted on October 28, 2003.  (Pl. App. D ¶ 10.)  HEN also had to certify to the Unted States Patent and Trademark Office ("USPTO") that it was the rightful owner of the '736 patent.  (Pl. App. D ¶ 11.)  Due to HEN's complicated corporate history, restructurings, and name changes, this process took approximately four months.  (Pl. App. D ¶ 13.)  On January 12, 2004, HEN finally filed a reexamination request for the '736 patent.  (Pl. App. D ¶ 14.)  The USPTO issued a certificate of reexamination on June 14, 2005, stating that no amendments were made to the patent and confirming the patentability of claims 1-7.  (Pl. App. D ¶ 15.)

HEN did not notify anyone at Minco of the reexamination proceeding.  (Pl. SMF ¶ 93.)  The

parties dispute, however, whether Minco had constructive notice of the reexamination proceeding. (Pl. SMF ¶¶ 94-95, Def. SMF ¶¶ 94-95.)  Minco received reports from its patent attorney showing the results of searches of competitive patents concerning molten metal sampling or sensing.  (Pl. App. C, R. Falk Dep. Vol I at 43:25-50:12.)  Additionally, notices of patent reexamination requests, such as the request that HEN filed with respect to the '736 patent, are published weekly in the Official Gazette of the USPTO.  (Pl. App. W at 1-2, 29.)

Minco contends that the only products at issue in this litigation are its model 215 and model 225 probes.  (Def. SMF ¶ 5, Def. SMF in Reply ¶ 129).  HEN, however, contends that there are at least five products at issue in this litigation because there are two versions of the model 215 probe (a pre-2004 215 probe and a post-2004 215 probe) and that there are three versions of the 225 probe (an ENO 225 probe; an ENO-MX 225 probe, which is an ENO style probe made at Minco's Mexican affiliate; and an ENO-L[M] 225 probe, which is an ENO style probe made by Minco China.  (Pl. SMF ¶ 96; Pl. App. P at 5.)  The post-2004 215 probe and the pre-2004 215 probe are essentially identical from the viewpoint of an infringement analysis regarding claims 3 and 6 of the '736 patent, the two claims at issue in this action.  (Pl. App. P at 22.)  Similarly, the ENO-L and the ENO-MX probes are essentially identical to the ENO 225 probe from the viewpoint of an infringement analysis regarding claims 3 and 6 of the '736 patent. (Pl. App. P at 40-41.)

The parties also dispute the characterization of their relationship with each other.  Minco contends that the relationship was "open and cooperative" (Def. SMF ¶¶ 9-10), and points to various communications between them concerning the following topics: a Minco patent 3,481,201; a license agreement between Minco and HEN-Japan pertaining to Japanese Utility Model 1,186,907; patent 3,805,621; Minco's U.S. patents 4,896,549 and 4,069,715; HEN's U.S. Patent 4,998,432; Minco's

U.S. Patent 5,014,561; Minco's U.S. patent 4,881,824; HEN's U.S. Patent 5,518,931; and HEN's U.S. Patent 6,370,973. (Def. SMF ¶¶ 12-91.) HEN admits that many of the communications between HEN and Minco took place; however, HEN denies that these communications demonstrate that the relationship between the parties was "open and cooperative." (Pl. SMF ¶¶ 9-91.) Moreover, HEN asserts that the parties had a long history of aggressively defending their respective intellectual property. (Pl. SMF ¶ 112; Pl. App. H, Midash Aff. at ¶¶ 4-9.)

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making

a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  In evaluating the evidence, we take the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 680 (3d Cir. 2003).  "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Technologies, Inc., 78 F. Supp. 2d 402, 407 (E.D. Pa. 2000).  Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. Callahan v. AEV, Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n. 9 (3d Cir. 1993)).

## IV.    DISCUSSION

Minco moves for summary judgment pursuant to the affirmative defenses of laches and equitable estoppel.  We find that there are genuine issue of material fact with respect to both of these defenses and therefore deny summary judgment.

### A.    Laches

Laches is an equitable defense to a claim for patent infringement.  A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc).  Laches is defined as "the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." Id. at 1028-29.  Where the defense of laches is established, the effect is that the patentee's claim for damages prior to suit may be barred. Id. For a defense of laches, the defendant has the burden of proving the following factors:  the patentee's delay in bringing the suit was unreasonable

and inexcusable, and the alleged infringer suffered material prejudice attributable to the delay.  Id.

The first factor - the length of time that may be deemed reasonable for laches purposes - is a flexible concept and depends on the circumstances of each case.  Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358, 1371 (Fed. Cir. 2001) (citing A.C. Aukerman, 960 F.2d at 1030).  A court must measure the delay from the time the patentee knew or reasonably should have known of the defendant's alleged infringing activities to the date of the suit.  A.C. Aukerman, 960 F.2d at 1033. It must also consider and weigh any justification that the patentee offers for its delay including, but not limited to:  (1) other litigation; (2) negotiations with the accused; (3) possible poverty or illness under limited circumstances; (4) wartime conditions; (5) the extent of the infringement; and (6) a dispute over the ownership of the asserted patent.  Id. at 1033.

With respect to the second factor in the laches analysis, prejudice to the defendant may be either economic or evidentiary.  Evidentiary prejudice occurs when, by reason of the delay, a defendant is unable to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories.  Id.  Economic prejudice occurs when a defendant suffers the loss of monetary investments or incurs damages which would have been prevented if the patentee brought suit earlier.  Id.  In determining if there is economic prejudice, the court must not merely consider those losses attributable to a finding of liability for infringement, but must look for a change in the defendant's economic position during the period of delay.  Id.

A presumption of laches arises where the patentee delays bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity, and this presumption shifts the burden of production (not the burden of persuasion) to the plaintiff.  A.C. Aukerman, 960 F.2d at 1037.  If a presumption of laches is established, the patentee may rebut the

7

laches factors with evidence showing either that the patentee's delay was reasonable or that the defendant suffered no prejudice or both.  Id. at 1038.  Rebutting a defense of laches does not eliminate this defense.  Rather, the defendant can still establish laches by establishing the elements for the defense based upon the totality of the evidence.  Id.

> 1. Whether the alleged infringement by the Minco products should be treated as a continuous tort for purposes of determining laches

Before addressing the elements of laches, we must first determine whether the various products at issue should be treated as a continuous tort so that the laches period for each of the products commenced at the same point in time.  Minco argues that there are only two products at issue in this case, and that the alleged infringement by the Minco products should be considered a single continuous tort for purposes of calculating the length of the delay because the products are similar and the nature of the alleged infringement by the two products is the same.  (Def. Mem. of Law at 25 n. 12.)  In contrast, HEN asserts that there are at least five infringing Minco products at issue in this case and that the period of delay for each product should be addressed individually because each product was introduced into the marketplace at different times.  (Pl. Mem. of Law at 19.)

In A.C. Aukerman, the United States Court of Appeals for the Federal Circuit held that infringing acts of the same nature are a continuous tort to which the defense of laches may be applied.  Id. at 1031.  "[W]here an alleged infringer's conduct changes over time – as, for example, where the infringer begins to manufacture a different product – a new period of delay begins for laches purposes with each change in conduct, unless the infringer can show that its prior conduct is substantially similar to the more recent conduct."  Intertech Licensing Corp. v. Brown & Sharpe

Mfg. Co., Inc., 708 F. Supp. 1432, 1435 (D. Del. 1989) (citing Celotex Corp. v. Jacuzzi Whirlpool

Bath, Inc., 211 U.S.P.Q. (BNA) 232, 233 (N.D. Ill. 1980); Nordson Corp. v. Graco, Inc., 187

U.S.P.Q. (BNA) 119, 120 (N.D. Ohio 1975); MGA, Inc. v. Centri-Spray Corp., 699 F. Supp. 610,

612, 615 (E.D. Mich. 1987); 4 D. Chisum, Patents, § 19.05[2][a][ii] at 19-169 to 19-170).

Therefore, a delay in bringing an infringement suit for different products will "tack" if the nature of

the alleged infringement remains substantially constant throughout the relevant time periods.  Id.

Each of the accused Minco probes is an immersion measuring probe for measuring oxygen

content in molten metal (HEN Opp. Ex P, ¶ 18, 65, 70, 119 and 122), and is accused of infringing

claims 3 and 6 of the '736 patent.  (HEN Opp. Ex. P, ¶ 14.)  The two versions of Minco's 215 probe

are essentially identical from the viewpoint of an infringement analysis regarding claims 3 and 6 with

the exception of a few differences in the elongated hollow electrically conductive tube.  (HEN App.

P, ¶ 65.)  The three versions of Minco's 225 probe are also essentially identical from the viewpoint

of an infringement analysis regarding claims 3 and 6.  (HEN App. P, ¶¶ 119, 122.)  HEN disputes

that the Minco probes are the same and points to record evidence of when each of the disputed

products first appeared on the marketplace.  This, however, does not address the question of whether

the products are substantially similar.  HEN also points to Minco's Supplemental Expert Report of

Robert Pehlke, which it contends provides different bases for non-infringement for each of the five

probes.  However, Mr. Pehlke's report summary provides eight common reasons why the pre-2004

215 and the post-2004 215 probes do not infringe the '736 patent, and cites five of these same

reasons to explain why the 225 probe and the 225-MX probe do not infringe the '736 patent, and

four of those reasons to explain why the 225-L[M] probe does not infringe the '736 patent.  (Pl. App.

Q at 14-15.)  Consequently, we reject HEN's assertion that there are substantially different bases for

non-infringement for each of the five probes, and we find as a matter of law that Minco's pre-2004

215 probe, post-2004 215 probe, 225 probe, 225-L[M] probe, and 225-MX probe are substantially

similar so that the laches period for each of these products commenced at the same point in time.

2.      Presumption of Laches

Having concluded that the laches period for each of the accused products commenced at the

same point in time, we must next consider whether the common laches period commenced more than

six years before this action was filed, such that a presumption of laches arises.  Minco argues that

HEN became aware of Minco's oxygen probes in November 1999, more than six years before it filed

this lawsuit on January 26, 2006.  HEN, however, argues that it did not have actual or constructive

notice of Minco's alleged infringing activity prior to January 26, 2000 and therefore the presumption

of laches should not apply in this case.

The laches period begins to run when the patentee knew or reasonably should have known

of the defendant's acts of alleged infringement.  A.C. Aukerman, 960 F.2d at 1037; see also Gasser

Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 773 (Fed. Cir. 1995) (stating that "the

laches period begins when "the plaintiff knew or reasonably should have known of its claim against

the defendant . . . ."); Intirtool, Ltd. v. Texar Corp., 369 F.3d 1289, 1297-98 (Fed. Cir. 2004) (noting

that "the patentee must have actual or constructive knowledge of an act of infringement that gives

rise to a legal claim before the clock begins to run against the patentee").  Constructive notice

embodies the principle that patentees have a duty to police their rights.  Wanlass v. General Electric,

148 F.3d 1334, 1338 (Fed. Cir. 1998).  "'The law is well settled that where the question of laches

is in issue the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry,

provided the facts already known by him were such as to put upon a man of ordinary intelligence the

duty of inquiry.'" Id. (quoting Johnston v. Standard Mining Co., 148 U.S. 360, 370 (1893)).  A duty to investigate whether there is infringement arises, for example, when there are sales, marketing, publication, public use of a product similar to or embodying technology similar to the patented invention, and/or published descriptions of the defendant's potentially infringing activities.  Id. When a patentee has no actual knowledge of sales, marketing, publication, public use, or other conspicuous activities of potential infringement, a patentee may be found to have constructive knowledge of infringement if these activities are sufficiently prevalent in the patentee's field.  Id.

The summary judgment record before us is insufficient to permit us to conclude as a matter of law that HEN had actual notice of Minco's alleged infringing activity before January 26, 2000. Minco has not identified evidence in the record to indicate that, prior to January 26, 2000,  HEN was aware that Minco's probes infringed one of HEN's patents.  Rather, the only evidence regarding HEN's actual knowledge prior to January 26, 2000, is that HEN had obtained samples of Minco's probes and conducted a competitive analysis on them.  There is no evidence that Mr. Conti detected during the course of this competitive analysis that the Minco probes infringed the '736 patent. Moreover, Mr. Conti testified at his deposition that he did not consider the possibility that Minco's probes infringed the '736 patent until March 2001.  Finally, while Minco emphasizes that Mr. Conti spoke with officials in Belgium about the Minco probes and sought opinions as to whether the Minco probes infringed the '736 patent in March 2000, this is immaterial to the issue of whether a presumption has arisen, because it did not occur before January 26, 2000.

The summary judgment record is also insufficient to permit us to find that HEN had constructive notice of Minco's alleged infringing activity before January 26, 2000.  Minco alleges that HEN obtained samples of and conducted a performance analysis on Minco's probes and that

there were sales of the 215 probe in 1999.  Minco, however, has not pointed to any evidence that Mr. Conti could have detected that the Minco probes infringed the '736 patent when he performed his competitive analysis.  See R2 Medical Systems, Inc. v. Katecho, Inc., 931 F. Supp 1397, 1411 (N.D. Ill. 1996) (denying motion for summary judgment on the defense of laches in part because there was no constructive notice of alleged infringement or duty to conduct further inquiry as there was no evidence that a previous examination of the product could have detected the alleged infringement). Accordingly, drawing all inferences in favor of HEN, a reasonable fact-finder could conclude that Mr. Conti's competitive analysis in November 1999 did not suggest infringement, and thus HEN did not have a duty to inquire into whether Minco's probes infringed the '736 patent.  Minco also fails to point to evidence that HEN was aware of Minco's sales of the 215 probe prior to January 26, 2000.  Rather, Minco merely asserts that it was "certain that HEN was aware of Minco's oxygen probe sales because virtually all of Minco's sales of its model 215 and 225 probes made between 1999 and 2004 were made to customers previously purchasing from HEN." (Def. SMF ¶ 102.) HEN, on the other hand, has pointed to submissions evidencing that it was not aware that the 215 probe was sold on the open market in November 1999 and that it believed the probes it obtained were only prototypes.  Likewise, with regard to constructive notice of Minco's sales, Minco has not pointed to evidence in the record to show that its sales prior to January 26, 2000 were so prevalent as to warrant a finding of constructive notice.  Consequently, we cannot find as a matter of law that a presumption of laches has arisen in this suit against any of the products at issue based on actual or constructive knowledge of Minco's alleged infringing activity.

   3.  Whether HEN's delay was unreasonable and inexcusable

   Even without a presumption of laches, Minco may still be entitled to summary judgment on

its affirmative defense of laches if there are no genuine issues of material fact with respect to the laches defense, and if we find as a matter of law that HEN's delay was unreasonable and inexcusable and that the delay caused prejudice to Minco.

> a.   Determining when HEN knew or should have known of the alleged infringing activity

A threshold inquiry in the laches analysis involves determining the length of plaintiff's delay in filing suit. Intertech Licensing Corp. v. Brown & Sharpe Mfg. Co._, 708 F. Supp. 1423, 1434 (D. Del. 1989). The period of delay begins when the patentee knew or reasonably should have known of the alleged infringement. A.C. Aukerman, 960 F.2d at 1034. As discussed above, we cannot find as a matter of law that HEN had actual or constructive notice of Minco's alleged infringing conduct in November 1999. The next date on which HEN arguably had actual or constructive notice is March 2000, when Mr. Conti discussed the possibility of a Minco probe infringing the '736 patent with his Belgian colleagues. Even assuming that the delay period commenced at that point in time, we conclude that Minco has not carried its summary judgment burden of establishing that HEN's delay was unreasonable.

> b.   Reasonableness of the delay

A court must consider and weigh any justification offered by the patentee for its delay including, but not limited to: (1) other litigation; (2) negotiations with the accused; (3) possible poverty or illness under limited circumstances; (4) wartime conditions; (5) the extent of the infringement; and (6) a dispute over the ownership of the asserted patent. A.C. Aukerman, 960 F. 2d at 1033. Using this flexible analysis, courts have excused delays in pursuing infringement actions when the infringer's actions are not commercially significant. See Genzyme Corp. v. Atrium

13

Medical Corp., Civ. A. No. 00-958-MPT, 2003 U.S. Dist. LEXIS 12784, *17 (D. Del. July 22, 2003) (noting that patent owners are not expected to incur large costs to silence commercially insignificant infringers and that waiting until litigation makes clear economic sense is reasonable); McKesson Information Solutions LLC v. The Trizetto Group, 426 F. Supp. 2d 203 (D. Del. 2006) (denying summary judgment on defense of laches because there were genuine issues of material fact regarding whether patentee's delay in bringing suit was reasonable in part because bringing suit sooner did not make economic sense). Involvement in other litigation has also served as an excuse for a delay in bringing an infringement action. A.C. Aukerman, 960 F.2d at 1033; Hemstreet v. Computer Entry Systems Corp., 972 F.2d 1290, 1293 (Fed. Cir. 1992); see also Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 877-78 (Fed. Cir. 1991) (recognizing that reexamination may qualify as other litigation excusing a delay in bringing suit). Prior to A.C. Aukerman, some courts required explicit notice to the defendant of both the existence of the other proceeding and the patentee's intent to enforce it rights against the alleged infringer at the conclusion of the other litigation. See Hemstreet v. Computer Entry Sys. Corp., 972 F.2d at 1293 (citations omitted). However, "Aukerman has clarified that this is far from a hard and fast requirement. Instead, Aukerman restores equitable flexibility: 'The equities may or may not require that the plaintiff communicate its reasons for delay to the defendant.'" Id. (quoting A.C. Aukerman, 960 F.2d at 1033). "Where there is prior contact between the parties, the overall equities may require appropriate notice." A.C. Aukerman, 960 F.2d at 1039; see also Hall v. Aqua Queen Manufacturing, Inc., 93 F.3d 1548, 1554 (Fed. Cir. 1996) (stating that the district court did not abuse its discretion by finding that patentee could not rely on other litigation to excuse its delay because patentee had not given notice to defendants of his intent to sue them once other litigation concluded).

In explaining its delay, HEN asserts that in 1999, it was only aware of Minco's prototype. Thereafter, HEN understood Minco's sales to be nominal between 2000 and 2001. After Minco's sales became more significant, Mr. Conti performed an infringement analysis and consulted with counsel in March 2001. At that time, Mr. Conti believed that the Minco probes infringed the '736 patent and decided that further action to enforce the patent was warranted. Prior to instituting an infringement action, however, HEN asked the USPTO to reexamine the '736 patent to make sure that it was valid in light of prior art references in the Japanese application. That reexamination required HEN to obtain translations of the Japanese references. HEN next discovered that there was a lapsed maintenance fee on the '736 patent, and had to investigate whether the patent could be revived and, if possible, file a petition for reinstatement. HEN also had to establish to the USPTO, through research and documentation, that it was the owner of the '736 patent in light of its complex corporate history. Finally, HEN had to prepare, file, and prosecute the reexamination request.

### i.      *Commercially significant*

HEN has pointed to evidence in the record that it believed Minco's activities were not commercially significant until 2001. (Conti Dep. ¶ 12.) Minco, however, points to evidence that there was no significant difference between Minco's commercial activity in 2000 and 2001. (Def. Reply Brief at 8.) Therefore, there is a genuine issue of material fact as to whether HEN's delay in filing suit is partly excused because Minco's alleged infringing activity was not commercially significant until 2001.

### ii.      *Other litigation*

Another reason for the delay was the existence of other litigation in the form of reexamination proceedings for the '736 patent. However, Minco claims that it did not have actual

or constructive notice of the reexamination proceedings and, therefore, this other litigation cannot excuse HEN's delay in bringing suit.  Whether HEN was required to provide notice, either actual or constructive, of the reexamination proceedings is determined by examining the overall equities. A.C. Aukerman, 960 F.2d at 1039.  Minco argues that the equities in this case required HEN to provide notice due to the long-standing, amicable relationship between the parties, including numerous communications regarding patent infringement issues and potential patent infringement issues.[1]  HEN responds with a host of arguments as to why the equities did not require it to notify Minco of the reexamination proceeding.  First, it contends that requiring a patentee to inform a potential infringer of a reexamination proceeding unwisely turns the patentee's prudent conduct of seeking a reexamination into a sword to be used against it.  See Motorvac Technologies, Inc. v. Norco Industries, Inc., 2004 U.S. Dist. LEXIS 4216 (C.D. Cal. Jan. 12 2004).  HEN next argues that the purpose of the notice requirement, which is to warn the accused infringer of the existence of the suit and that a subsequent suit will be filed against it, is not served by requiring notice in the context of a reexamination proceeding because a reexamination proceeding can be initiated for a number of reasons, not just as a preparatory step to filing an infringement action.  HEN further maintains that providing notice of a reexamination will not cause a rational infringer to alter its conduct when the patent may be invalidated during reexamination.  HEN also maintains that notice in this case would have been superfluous given that Richard Falk, Minco's former president, was aware of the potential infringement and was already concerned about a potential lawsuit even before the reexamination

---

[1]Minco points to evidence that there has been a long-standing, open and cooperative relationship between Minco and HEN (or its predecessors) for more than 30 years.  (Minco SMF ¶ 10; App. D ¶ 154).  Minco also cites to numerous communications between the parties regarding different patent matters.  (Minco SMF ¶¶ 12-91.)  None of the prior communications between Minco and HEN dealt with the '736 patent.

period.  (Minco App. D ¶¶ 43, 162; Richard Falk Dep., App. C at 55:6-56:8.)  Therefore, HEN argues that the imposition of a notice requirement in this context would merely encourage empty threats and gratuitous gestures.  See Tristrata Technology, Inc. v. Cardinal Health, Inc., 2004 U.S. Dist. LEXIS, *12 (D. Del. Jan. 16, 2004) (stating that "although it was within [patentee's] power to send all possible infringers a minimally researched notice of an intent to sue, the merits of giving possible infringers such a notice must be balanced against the disadvantages of encouraging empty threats and gratuitous gestures").  HEN also argues that HEN and Minco are in fierce competition with one another in the oxygen probe market, and that requiring HEN to inform its competitor of its intentions with respect to its intellectual property is incompatible with notions of free and fair competition.  Finally, HEN argues that the prior contact between HEN and Minco does not impose an absolute requirement of notice with respect to the '736 patent because the prior contact between HEN and Minco did not relate to this patent.

Ultimately, we find that there is insufficient evidence at this stage of the proceedings to permit us to conclude as a matter of law that the balance of the equities favors either one side or the other with respect to this notice issue.  Moreover, assuming arguendo that notice of the reexamination proceeding was required, there is also a genuine issue of material fact as to whether that notice requirement was satisfied.  Minco asserts that it had neither actual nor constructive notice (Richard A. Falk Dep. ¶ 166; R. Joel Falk Dep. ¶ 26), whereas HEN asserts that Minco must have had actual notice because Minco instructed its lawyers to keep abreast of the status of all industry patents and was particularly preoccupied with the '736 patent.  (HEN App. C, Richard Falk Dep. 43:25-50:12; App. I. at M00340-M00362.)

iii.    *Additional arguments regarding reasons for the delay*

Addressing HEN's remaining excuses for delay, Minco first notes that no court has recognized such excuses as justifying a delay in filing an infringement suit.  Minco asserts that it "strains common sense and credulity" that it took HEN fifteen months (from March 2000 to June 2001) to obtain authorization to initiate a reexamination of the '736 patent based on the Japanese references.  Minco also asserts that HEN knew about the problem with the '736 patent due to the Japanese references since at least 1994, and yet waited ten years to initiate a reexamination proceeding.  (Minco SMF ¶ 109, App. H, Ex. 19 at HEN-001893-1897.)  Minco asserts that it is difficult to imagine that there was such a long delay in obtaining "satisfactory translations" of the prior art references cited in the reexamination petition.  Minco also asserts that HEN's negligence in failing to pay a maintenance fee on the '736 patent should not be allowed to excuse the unreasonable delay in filing this lawsuit.  Moreover, Minco asserts that a petition to reinstate is an extraordinarily simple document to prepare and file, and emphasizes that the petition in this case was only two pages long and was processed in just two months.  (Def. App. M and N.)  Minco also notes that the reexamination process was completed on June 14, 2005, but that it took an additional seven months for HEN to file the instant lawsuit in January 2006.  (Pl. App. D ¶ 15.)

Minco's argument that HEN's excuses for delay have not been recognized by any court as providing a legally sufficient excuse is without merit.  Courts have recognized other litigation and the extent of infringement as valid excuses for delays in bringing infringement actions.  As for HEN's excuses relating to its actions prior to filing the reexamination petition, courts have held that whether the length of delay is reasonable depends on the circumstances of each case.  See Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358, 1371 (Fed. Cir. 2001) (citing A.C. Aukerman, 960 F.2d at

1030).  Furthermore, the list of previously recognized excuses provided in A.C. Aukerman was not

exhaustive.  A.C. Aukerman, 960 F.2d at 1033.

Finally, we note that the United States Court of Appeals for the Third Circuit has stated that

"[b]ecause the correct disposition of the equitable defense of laches can only be made by a close

scrutiny of the particular facts and balancing of the respective interests and equities of the parties,

as well as the general public, it usually requires the kind of record only created by full trials on the

merits."  Country Floors v. Partnership of Gepner & Ford, 930 F.2d 1056, 1066 (3d Cir. 1991)

(citation and internal quotations omitted).  We find that this is true in the instant case.  Based on the

summary judgment record before us, we cannot find that the delay between HEN's decision to

pursue a reexamination and its filing of a reexamination petition, though certainly open to question,

was unreasonable and inexcusable as a matter of law.

Because there are either factual disputes or insufficient summary judgment evidence to find

as a matter of law that HEN's delay was unreasonable and inexcusable, we cannot grant Minco's

motion for summary judgment with respect to its affirmative defense of laches.[2]

B.      Equitable Estoppel

Whether to grant equitable estoppel to assert a claim is a decision committed to the sound

discretion of the trial court.  A.C. Aukerman, 960 F.2d at 1041 (citing cases).  Equitable estoppel

bars all relief on a particular claim.  Id.  The defense of equitable estoppel in a patent infringement

action has three important elements: (1) a patentee, through statements or conduct that communicate

something in a misleading way, leads the alleged infringer to reasonably infer that the patentee does

---

[2]Because Minco has not met its burden with respect to the first element of the defense of laches, we need not address the arguments pertaining to whether Minco suffered material prejudice, the second element of the affirmative defense of laches.

not intend to enforce the patent against the alleged infringer; (2) reliance by the infringer on the patentee's conduct; and (3) material prejudice to the alleged infringer as a result of the reliance if the patentee is permitted to proceed with its infringement suit.  ABB Robotics v. GMFanuc Robotics Corp., 52 F.3d 1062, 1063 (Fed. Cir. 1995) (citing A.C. Aukerman, 960 F.2d at 1028); see also Hemstreet, 972 F.2d at 1294.  The first element of equitable estoppel may in some instances be based upon misleading silence, but mere silence must be accompanied by some other factor which indicates that the silence was sufficiently misleading as to amount to bad faith.  Hemstreet, 972 F.2d at 1295 (citing cases). A threat of immediate and vigorous enforcement by a patentee of its patent rights followed by silence may be the most common way that silence can be misleading; however, it is not the only set of facts that can support a finding of misleading silence.  ABB Robotics, 52 F.3d at 1064.  Inaction "combined with other facts respecting the relationship or contacts between the parties" may "give rise to the necessary inference that the claim against the defendant is abandoned."

A.C. Aukerman, 960 F.2d at 1042.  On summary judgment, the inference that the patentee was not going to enforce the patent against the defendant must be the only inference possible from the evidence of the patentee's course of conduct.  A.C. Aukerman, 960 F.2d at 1044.     Minco relies on the following submissions to demonstrate that HEN's silence amounts to  misleading conduct.  Minco asserts that the parties have a history of "cooperative behavior" in which they have advised one another of potential patent disputes.  This "cooperative behavior" includes more than 40 letters regarding more than 10 different patents over the course of 34 years starting in 1973. (Minco SMF ¶¶ 8-91.)  These communications involved the following topics:  allegations of infringement (App. H, Ex. 10 at M001097; Ex. 14 at HEN001984); discussions regarding the settlement agreements to patent disputes (App. H. Ex. 10 at M001111); discussions regarding

licensing agreements in response to accusations of infringement (App H. Ex. 10 at M001102), responses to allegations of infringement (App. H Ex. 13 at M001148); sending copies of patents (App. H Ex. 14 at HEN001985-1990); requests for samples of allegedly infringing products (App. I Ex. 37 at HEN002653); notification of changes to a product in light of accusations of infringement (App. H. Ex. 14 at HEN001992-1993); withdrawals of infringement claims (App. H. Ex. 13 at M001154); withdrawals of allegedly infringing products from the marketplace (App. H Ex. 14 at HEN001991); and notification of the introduction into the marketplace of a new product in response to allegations of infringement by a prior product (App. H Ex. 14 at HEN001992-1993). Minco also asserts that over the thirty-four year history between the parties, there has never been an instance of one party filing suit against the other without first attempting to resolve the situation amicably. (Minco App. E ¶ 25.) Minco asserts that from 2001 to the present, the President of Minco, Joel Falk, had at least seven face to face meetings with Michael Midash, HEN's President; Chris Vangeel, HEN's Vice-President; and/or Taco Gerbranda, HEN's top executive worldwide where they discussed patent matters (Minco App. E).  According to Minco, during one of these meetings regarding another patent matter unrelated to this suit, Mr. Falk asked Mr. Midash whether any other patent matters need to be addressed, and Mr. Midash responded "No." (App. E ¶ 22.)  Neither Mr. Midash, Mr. Vangeel, nor Mr. Gerbranda ever mentioned the '736 patent or its reexamination. (App. E. ¶ 24.)  Minco argues that the history of cooperation between the parties along with HEN's silence regarding its intention to file suit, is sufficient to constitute misleading conduct as required by the first element of equitable estoppel.

There is a dispute of fact with respect to Minco's assertion that Mr. Falk asked Mr. Midash at one of their meetings if any other patent matters needed to be addressed and that Mr. Midash

replied "No." HEN denies that Mr. Falk asked such a question, and that Mr. Midash answered "No." (HEN App. H ¶ 13.)  Minco's remaining evidence is insufficient to support a finding that HEN's silence was misleading.  At no point did HEN communicate to Minco regarding the '736 patent.  The prior communication between the two parties involved only communication regarding other patent disputes.  In the cases relied upon by Minco in its argument, there was prior communication between the parties regarding the patent in suit.  For example, Minco relies on Scholle Corp. v. Blackhawk Molding Co., Inc., 133 F.3d 1469 (Fed. Cir. 1998).  In Scholle, the Federal Circuit affirmed the district courts grant of summary judgment to the defendant based on equitable estoppel.  Id. at 1473. Scholle, the owner of the rights to the '354 patent, advised Blackhawk and other companies in 1991 that they were infringing the '354 patent.  Id. at 1470.  In 1993, Blackhawk presented an alternative product to Scholle's CEO, and informed him that they would consider the new product to be outside the scope of the '354 patent unless Scholle advised Blackhawk otherwise.  Id.  High-level corporate officials from both companies had numerous contacts after this 1993 meeting, and many of these contacts involved the '354 patent.  Id.  However, Scholle made no suggestion that it might consider Blackhawk's alternative product to infringe the '354 patent.  Id. at 1371.  The Federal Circuit found that it was wholly reasonable for Blackhawk to infer that it would not be sued for infringement given that Scholle's silence occurred in the face of Blackhawk openly touting its alternative product as the design-around successor to the previously accused product.  Id.  The court also found that this inference was reenforced by the parties course of dealings which included numerous discussions of other litigation dealing with the '354 patent.  Id.  Unlike the facts in Scholle, here the parties never previously threatened a lawsuit with respect to the patent in suit, nor did the principals of HEN and Minco ever have a conversation in which the patent in suit was discussed.  Though Minco and HEN

22

have exhibited cooperative behavior in the past with respect to other patent issues, they did not exhibit any cooperative behavior with respect to the '736 patent.

Similarly, the Federal Circuit's opinion in <u>ABB Robotics</u>, 52 F.3d 1062 (Fed. Cir. 1995) also supports a finding that the evidence submitted by Minco is insufficient to support a finding of equitable estoppel.  In <u>ABB Robotics</u>, the Federal Circuit affirmed the district court's award of summary judgment on equitable estoppel based on the following misleading conduct by the patentee: the patentee's objection to the defendant's activities as infringing, followed by defendant's denial of infringement and then a long period of inaction; the relationship between the patentee and the defendant's parent corporation, which was the patentee's largest customer; defendant's knowledge that the patent was not commercially active in the area of the patent in suit and was therefore not losing sales or profits as a result of the alleged infringement; and other negotiations which took place between the patentee and the defendant which led to licensing agreements under other patents owned by the patentee.  <u>Id.</u> at 1064.  Unlike the facts in <u>ABB Robotics</u>, in the present case there has not been any prior communication between HEN and Minco regarding the patent in suit.

Consequently, we find that Minco has not presented sufficient evidence to permit us to conclude as a matter of law that HEN's silence was misleading, and we deny its motion for summary judgment with respect to the affirmative defense of equitable estoppel.  Because Minco has not presented sufficient undisputed evidence with respect to misleading conduct, we need not address the two additional elements of equitable estoppel.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HERAEUS ELECTRO-NITE CO.              :              CIVIL ACTION
                                      :
        v.                            :
                                      :
MIDWEST INSTRUMENT                    :
COMPANY, INC.                         :              NO. 06-355

## ORDER

**AND NOW**, this 12th day of July 2007, upon consideration of Defendant's Motion for

Summary Judgment (Docket No. 98), and all papers filed in connection therewith, **IT IS HEREBY**

**ORDERED** as follows:

1.      Defendant's Motion for Leave to File a Reply (Docket No. 113) is **GRANTED**;

2.      Plaintiff's Motion for Leave to File a Sur-reply (Docket No. 118) is **GRANTED**;

3.      Defendant's Motion for Summary Judgment is **DENIED**.


                        BY THE COURT:


                        s/ John R. Padova, J.
                        John R. Padova, J.